Paul C. Cataudella (CA SBN: 278495)
**CATAUDELLA LAW, APC**
One America Plaza
600 West Broadway, Suite 700
San Diego, California 92101
P: 619.272.7035
E: Paul@CataudellaLaw.com

Attorney for Plaintiff
ADAM ELLIS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| ADAM ELLIS, an individual,<br><br>                              Plaintiff,<br><br>        v.<br><br>WORLDWIDE CAPITAL HOLDINGS, INC., a Delaware corporation; WORLDWIDE TECHNOLOGY GROUP, LLC, a Delaware limited liability company; NICHOLAS HENKELS, an individual; and DOES 1 – 100, inclusive,<br><br>                              Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1.   Breach Of Contract<br>2.   Breach Of Covenant Of Good Faith And Fair Dealing |

    Plaintiff ADAM ELLIS ("Mr. Ellis") complains and alleges as follows against Defendants WORLDWIDE CAPITAL HOLDINGS, INC. ("Worldwide Capital"), WORLDWIDE TECHNOLOGY GROUP, LLC ("Worldwide Technology") and NICHOLAS HENKELS ("Mr. Henkels") (collectively "Defendants").

**THE NATURE OF THE ACTION**

1.     Mr. Ellis brings this action under fundamental contract principles alleging that Defendants breached an Independent Contractor Agreement when they failed to pay Mr. Ellis his respective share of net profits derived by Worldwide Capital and its affiliated business organizations, while rendering services as a technology consultant. Additionally, Defendants breached the Independent Contractor Agreement when they failed to pay Mr. Ellis his final wages, respective of his base salary, subsequent to submitting his notice of resignation as a technology consultant.

**THE PARTIES**

2.     Mr. Ellis is and at all relevant times was an individual residing in the State of California, County of Riverside.

3.     Worldwide Capital is and at all relevant times was a Delaware corporation with its principal place of business in the State of Arizona, County of Maricopa.

4.     Worldwide Technology is and at all relevant times was a Delaware limited liability company with its principal place of business in the State of Arizona, County of Maricopa.

5.     Mr. Henkels is and at all relevant times was an individual residing in the State of Arizona, County of Maricopa. Mr. Henkels is and at all relevant times was the President and Chief Executive Officer of Worldwide Capital and Worldwide Technology.

6.     Mr. Ellis alleges that Mr. Henkels is and at all relevant times was a member, shareholder, director, principal, and/or officer of Worldwide Capital and Worldwide Technology, and there exists, and at all times relevant therein, existed a unity of interest and ownership between Mr. Henkels, Worldwide Capital and Worldwide Technology, such that any individuality

- COMPLAINT FOR DAMAGES -

and separateness between them ceased. Mr. Ellis further alleges that Worldwide Capital and Worldwide Technology are the alter ego of Mr. Henkels, in that Worldwide Capital and Worldwide Technology are, and at all relevant times mentioned herein, have been a mere shell, instrumentality, and conduit through which Mr. Henkels carried on business in the business name exactly as Mr. Henkels had conducted it before formal inception.

7.      Mr. Ellis alleges that Mr. Henkels has (a) completely controlled, dominated, managed, and operated Worldwide Capital and Worldwide Technology for his sole and exclusive benefit; (b) has commingled assets of Worldwide Capital and Worldwide Technology with his own personal assets to suit his needs and convenience; (c) has failed to maintain any degree of separateness with Worldwide Capital and Worldwide Technology; (d) has failed to observe business formalities; (e) has carried out the activities of Worldwide Capital and Worldwide Technology without the holding of member's, director's or shareholders' meetings; (f) has not maintained proper records or minutes of the business proceedings; and (g) has controlled and operated Worldwide Capital and Worldwide Technology as a device to avoid individual, agency, and respondeat superior liability.

8.      Mr. Ellis alleges that Mr. Henkels has used Worldwide Capital and/or Worldwide Technology funds to purchase personal assets and items, including, but not limited to, a home, numerous vehicles, gifts to family members, personal vacations, gambling expenses, and his own wedding.

Worldwide Capital and Worldwide Technology utilize the same business office in Scottsdale, Arizona, along with other business organization belonging to Mr. Henkels not mentioned herein. Worldwide Capital and Worldwide Technology utilized the same employment personnel, including, but not limited to, human resources professionals and Mr. Ellis. Mr. Ellis alleges that Mr. Henkels has committed additional acts and omissions sufficient to impose alter ego liability of which Mr. Ellis is currently unaware.

9.    Mr. Ellis alleges that adherence to the fiction of the separate existence of Worldwide Capital and Worldwide Technology as an entity distinct from Mr. Henkels would permit an abuse of business privilege and would sanction fraud and promote injustice in that it would allow Mr. Henkels to escape personal liability for the wrongs herein alleged by granting to him the protection of Worldwide Capital's and Worldwide Technology's corporate veil.

10.    Mr. Ellis is ignorant of the true names and capacities of defendants sued herein as DOES 1 – 100, inclusive, and therefore sues these defendants by such fictitious names.  Mr. Ellis will amend this complaint to allege their true names and capacities when ascertained.  Mr. Ellis is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Mr. Ellis' injuries as herein alleged were proximately caused by their conduct.

11.    Mr. Ellis is informed and believes and thereon alleges that at all times mentioned herein, each of the Defendants was the agent and employee of each of the remaining Defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency and employment.

## JURISDICTION & VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship) as Mr. Ellis is a resident of a different state from that of Defendants, and because the value of the matter in controversy exceeds $75,000.

13.    Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions on which Mr. Ellis' claim is based occurred in the Central District of California.

## BACKGROUND

14.    On May 15, 2012, Mr. Ellis and Worldwide Capital entered into an Independent Contractor Agreement ("Agreement"). A true and correct copy of the Agreement is attached hereto as "Exhibit 1." Pursuant to the Agreement, Mr. Ellis agreed to render technical consulting services in the form of computer application development for a period of one year, beginning on May 8, 2012. Mr. Ellis was responsible for, *inter alia*, software development and programming, technical maintenance, tracking and data analysis, and site management. Mr. Ellis worked from his home, as well as from Worldwide Capital's office in Temecula, California.

15.    In exchange for Mr. Ellis' above described services, Mr. Ellis was to receive an annual salary of $65,000, in addition to 5% of Worldwide Capital's net profits in an amount not to exceed $200,000, pursuant to the Agreement. According to the Agreement, "net profit" was defined as Worldwide Capital's

gross revenues, less all expenses incurred by Worldwide Capital, that were derived from Worldwide Capital's "ownership from operating entities and partnerships, in which [Mr. Ellis'] performance directly relates and contributes to the success of the organizations." Mr. Ellis accepted this salary with the understanding that once Worldwide Capital and its affiliated business organizations began generating a profit, his overall compensation would increase.

16.    Almost immediately after executing the Agreement, Mr. Ellis' scope of services under the Agreement quickly expanded to a role best suited for an executive of the company; not a consultant. Mr. Ellis was tasked with, *inter alia*, constructing and implementing company policies, hiring and managing employees, and making executive business decisions on behalf of the company. Mr. Ellis was essentially running the entire technology division of the company, while Mr. Henkels assumed a much more passive role.

17.    In order to meet the high demands of Worldwide Capital and Mr. Henkels, Mr. Ellis formed Flow Tech Consulting, LLC, a California limited liability company, in June 2012 in order to retain his own employment personnel to assist with the high work volume.

18.    In light of the above-described circumstances, Mr. Ellis felt compelled to meet with Mr. Henkels on or about August 2012 to discuss his expanded responsibilities, coupled with his idle compensation. Mr. Henkels recognized how hard Mr. Ellis was working, and went so far as to comment that he deserved an increase in Mr. Ellis' profit share of 5% (i.e., suggesting Mr. Ellis should receive 10%, as opposed to 5%, of net profits).

19.    At a later meeting between Mr. Ellis and Mr. Henkels that summer, Mr. Ellis expressed his frustrations about the lack of change surrounding his respective scope of services, and imbalanced compensation.  In response, Mr. Henkels told Mr. Ellis that he believed Mr. Ellis was 95% of the business,

1  that Mr. Ellis was second in command of the company, and that Mr. Ellis was

2  going to have a stake in a prospective technology company.

3      20.    Mr. Ellis left each meeting hopeful that Mr. Henkels would follow

4  through on his words and, at the very least, recognize the existing

5  Agreement between the parties by paying Mr. Ellis his share of his

6  respective interest in the net profits of Worldwide Capital, and its affiliated

7  business organizations.  Unfortunately, however, this was not the case.

8      21.    On October 19, 2012, Mr. Henkels formed Worldwide Technology

9  without offering Mr. Ellis any ownership or equity interest in the company.

10 The terms of the Agreement remained in place without modification, and Mr.

11 Ellis was expected to continue rendering the expanded scope of services he

12 had rendered since the Agreement's inception without further discussion

13 about adjusting Mr. Ellis' compensation, or even fulfilling Worldwide Capital's

14 obligation to pay Mr. Ellis his share of his respective interest in the net profits

15 of Worldwide Capital, and its affiliated business organizations.

16     22.    In December 2012, Mr. Ellis received an increase in base salary of

17 $65,000. Although Mr. Ellis was appreciative, it still paled in comparison to

18 the average salary of a person in a comparable position under similar

19 circumstances. Given that Mr. Ellis also had not received any payments

20 respective of his interest in the net profits of Worldwide Capital, and its

21 affiliated business organizations, Mr. Henkels' gesture felt more like an

22 attempt to provide a temporary solution to an ongoing problem.

23     23.    After nearly one year of the same dangling of the carrot routine, Mr.

24 Ellis demanded that Mr. Henkels address Mr. Ellis' concerns regarding his

25 expanded scope of services and disproportionate compensation. In

26 response, Mr. Henkels asked Mr. Ellis to draft a proposal suggesting how to

27 resolve this issue. Mr. Ellis immediately drafted a proposal and sent it to Mr.

28 Henkels within days, whereby, Mr. Henkels ignored the proposal for several

weeks. During this time, Mr. Ellis continued to receive his base salary, but had not received his originally bargained for quarterly payment of net profits, as prescribed by the Agreement.

24.   In February 2014, Mr. Ellis sought the assistance of counsel to facilitate the negotiation of Mr. Ellis' proposed terms of service and accompanying compensation. Mr. Ellis' counsel submitted a detailed proposal to Worldwide Technology outlining Mr. Ellis' demands, and requested that a meeting be scheduled to discuss the details. After three additional months of excuses from Worldwide Technology's General Counsel as to why Mr. Henkels was unavailable to meet with Mr. Ellis to discuss the proposal, Mr. Ellis understood that it was time to sever ties.

25.   On May 12, 2014, Mr. Ellis announced his resignation from Worldwide Technology, effective two weeks from the date of the letter (i.e., May 26, 2014). Upon receipt of Mr. Ellis final paycheck, only a portion of Mr. Ellis' base salary was provided, and no additional payments reflecting Mr. Ellis' share of his respective interest in the net profits of Worldwide Capital, and its affiliated business organizations, was present.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

26.   Plaintiff incorporates each of the foregoing paragraphs by this as if fully set forth.

27.   On May 15, 2012, Mr. Ellis entered into a valid written contract (the "Agreement") with Worldwide Capital.

28.   Mr. Ellis performed all conditions, covenants, and promises required to be performed in accordance with the Agreement.

29.   Worldwide Capital failed to perform its obligations under the Agreement by refusing to compensate Mr. Ellis in accordance with the terms and conditions contained therein. More specifically, Worldwide Capital

refused to pay Mr. Ellis a quarterly bonus valued at 5% of Worldwide Capital's net profits, as derived from Worldwide Capital's ownership in affiliated business organizations, over the course of two years. Additionally, Worldwide Capital failed to pay Mr. Ellis approximately one week's worth of his agreed upon base salary upon his resignation.

30.   As a direct and proximate result of Worldwide Capital's wrongful conduct, Mr. Ellis has suffered and continues to suffer economic damages in an amount to be proven at trial, but no less than $400,000.

## SECOND CLAIM FOR RELIEF

### (Breach of Covenant of Good Faith and Fair Dealing)

31.   Plaintiff incorporates each of the foregoing paragraphs by this as if fully set forth.

32.   Under Arizona law, the Agreement contained an implied covenant of good faith and fair dealing on the parties. Accordingly, the Agreement imposed a duty on Worldwide Capital to refrain from, unreasonably or without proper cause, acting or failing to act in a manner that deprives Mr. Ellis of the benefits of the Agreement.

33.   Worldwide Capital acted in a manner that deprived Mr. Ellis of the benefits of the Agreement when it, among other things:

a. Failed to pay Mr. Ellis his respective share of net profits; and

b. Failed to pay Mr. Ellis the remaining balance owed of Mr. Ellis' base salary following his resignation.

34.   Mr. Ellis performed all conditions, covenants, and promises required to be performed in accordance with the Agreement.

35.   As a direct and proximate result of Worldwide Capital's wrongful conduct, Mr. Ellis has suffered and continues to suffer economic damages in an amount to be proven at trial, but no less than $400,000.

/ / /

- COMPLAINT FOR DAMAGES -

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Ellis prays for relief, as follows:

1.  For compensatory damages in an amount to be proven at trial, but no less than $400,000;

2.  For incidental expenses in an amount according to proof at the time of trial;

3.  For costs of suit and reasonable attorneys' fees herein incurred;

4.  For interest thereon at the maximum legally permissible rate; and

5.  For such other and further relief as this Court deems proper.

Dated: July 11, 2014                    **CATAUDELLA LAW, APC**

By: _____

PAUL C. CATAUDELLA
Attorney for Plaintiff
ADAM ELLIS

1    **<u>DEMAND FOR JURY TRIAL</u>**

2           Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mr.

3    Ellis hereby demands a trial by jury on all issues raised by the Complaint.

4

5

6    Dated: July 11, 2014                    **CATAUDELLA LAW, APC**

7

8                                      By: _____

9                                          PAUL C. CATAUDELLA
10                                         Attorney for Plaintiff
11                                         ADAM ELLIS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

- COMPLAINT FOR DAMAGES -

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (the "Agreement") is made and entered into this 15th day of May, 2012, by and between Adam Ellis located at 22756 Valley Vista Circle Wildomar, CA 92595 United States (the "Consultant"), and Worldwide Capital Holdings, LTD a United Kindom corporation, Worldwide Capital Holdings, Corp a Delaware corporation "and or its nominee" (the "Client"), whose principal place of business is 11259 East Via Linda Ste. 100-975 Scottsdale, AZ 85259, United States.

WHEREAS, Consultant is in the business of computer application development, including technical consulting services, software development and maintenance.

WHEREAS, the Client deems it to be in its best interest to retain Consultant to render such technical consulting services in order to help develop and market the business of the Client; and

WHEREAS, Consultant is ready, willing, and able to render such technical consulting services to the Client, as hereinafter described, on the terms and conditions more fully set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Consulting Services.   The Client hereby retains the Consultant as an independent consultant to the Client, and the Consultant hereby accepts and agrees to such retention. The Consultant shall render to the Client such services as set forth on **Exhibit A**, attached hereto and by reference incorporated herein.

2.     Independent Contractor.   Consultant agrees to perform its consulting duties hereto as an independent contractor.   Nothing contained herein shall be considered to create the relationship of client-Consultant between the parties to this Agreement.  The client shall not be liable to third parties for the acts of Consultant or its servants or agents in performing the consulting duties hereunder, except in the case of damages or injuries caused directly by the Client's agents or Consultants, or if the Consultant shall have been acting on behalf of the client.  The Client shall not make social security, workers' compensation or unemployment insurance payments on behalf of Consultant.   The parties hereto acknowledge and agree that Consultant cannot guarantee the results or effectiveness of any of the services rendered or to be rendered by Consultant hereunder.  Rather, Consultant shall use its best efforts to conduct its services and affairs in a professional manner and in accordance with good industry practice.

3.     Time, Place and Manner of Performance.   The Consultant shall be available for advice and counsel to the members of the Client at such reasonable and convenient times and places as may be mutually agreed upon.  Except as aforesaid, the time, place and manner of performance of the services hereunder, including the amount

of time to be allocated by the Consultant to any specific service, shall be determined in the sole discretion of the Consultant.

     4.    <u>Term of Agreement</u>.  The term of this Agreement shall be one (1) year, commencing on May 8, 2012, and terminating May 8, 2013, subject, however, to prior termination as hereinafter provided.

     5.    <u>Renewal of Agreement by Parties</u>.  The Consultant and the Client may opt to terminate this Agreement by providing the other party with notice of such termination, such notice not to be less than thirty (30) days prior to the termination date specified in Paragraph 4 above, and such notice shall be provided in writing.  In the event, that 30 days prior to the expiration of this Agreement, neither party has opted to terminate the Agreement, this Agreement shall, on its terms, shall terminate in pursuant to the date provided in Paragraph 4 above.

     6.    <u>Compensation -- Consulting Fee</u>.  In full consideration of the services to be provided for the Client by the Consultant, as fully set forth in **Exhibit A**, upon execution of this Agreement, the Client agrees to compensate Consultant in the manner set forth on **Exhibit B**.

     7.    <u>Expenses</u>.  The Client shall reimburse the Consultant for all pre-approved expenses and disbursements incurred by the Consultant on behalf of the Client in connection with the performance of the consulting services pursuant to this Agreement.

     8.    <u>Termination</u>.

     (a)    Consultant's relationship with the Client hereunder may be terminated at any time by mutual written agreement of the parties hereto.

     (b)    This Agreement shall terminate upon the dissolution, bankruptcy or insolvency of the Client.

     (c)    This Agreement may be terminated by either party upon giving written notice to the other party if the other party is in default hereunder and such default is not cured within fifteen (15) days of written notice of such default.

     9.    <u>Work Product</u>.  It is agreed that all information and materials produced for the Client shall be the property of the Client, free and clear of all claims thereto by the Consultant, and the Consultant shall retain no claim of authorship therein.

     10.    <u>Confidentiality</u>.  The Consultant recognizes and acknowledges that it has and will have access to certain confidential information of the Client and its affiliates that are valuable, special and unique assets and property of the Client and such affiliates. The Consultant will not, during or after the term of this Agreement, disclose, without the prior written consent or authorization of the Client, any of such information to any person, except to authorized representatives of the Consultant or its affiliates, for any reason or purpose whatsoever.  In this regard, the Client agrees that such authorization or consent to disclosure may be conditioned upon the disclosure being made pursuant

to a secrecy agreement, protective order, provision of statute, rule, regulation or procedure under which the confidentiality of the information is maintained in the hands of the person to whom the information is to be disclosed or in compliance with the terms of a judicial order or administrative process.

11.    <u>Conflict of Interest</u>.  The Consultant shall be free to perform services for other persons.  The Consultant agrees not to solicit existing customers of the Client to use other services offered by Consultant without the prior written permission of the Client.    The Client agrees not to unreasonably withhold or delay such written permission.

12.    <u>Disclaimer of Responsibility for Acts of the Client</u>.  The obligations of Consultant described in this Agreement consist solely of the furnishing of information and advice to the Client in the form of services.  In no event shall Consultant be required by this Agreement to represent or make management decisions for the Client. All final decisions with respect to acts and omissions of the Client or any affiliates and subsidiaries shall be those of the Client or such affiliates and subsidiaries, and Consultant shall under no circumstances be liable for any expense incurred or loss suffered by the Client as a consequence of such acts or omissions.

13.    <u>Indemnity by the Client</u>.  The Client shall protect, defend, indemnify and hold Consultant and its assigns and attorneys, accountants, Consultants, members, and agents harmless from and against all losses, liabilities, damages, judgments, claims, counterclaims, demands, actions, proceedings, costs and expenses (including reasonable attorneys' fees) of every kind and character resulting from or relating to or arising out of (a) the inaccuracy, nonfulfillment or breach of any representation, warranty, covenant or agreement made by the Client herein; or (b) any legal action, including any counterclaim, to the extent it is based upon alleged facts that, if true, would constitute a breach of any representation, warranty, covenant or agreement made by the Client herein; or (c) negligent actions or omissions of the Client or any Consultant or agent of the Client or any reckless or willful misconduct, occurring during the term hereof with respect to any of the decisions made by the Client.

14.    <u>Non-Disparagement.</u>  Consultant will use his or her best efforts at all times to promote and protect the good name of Client, as well as that of their respective officers, directors, Consultants, agents, and services. Without limiting the foregoing, both during his or her tenure with client and thereafter, Consultant will not defame or disparage the business, services, officers, Consultants or other representatives of Client, or otherwise do anything to detract from or reflect adversely upon their reputation, nor will Consultant engage in any unfair trade practices with respect to Client.

15.    <u>Non-Competition.</u>  Consultant acknowledges that Client has expended and will expend significant resources recruiting and training Consultant, and has granted and will grant Consultant access to its trade secrets and confidential and proprietary information.  In recognition of these expenditures, and in consideration for Consultant's continued relationship with Client, Consultant agrees that:

(a)     During his tenure with Client, and for a period of one (1) years thereafter, Consultant will not engage in any conduct or business which is competitive to Client.  In accordance with this restriction, but without limiting its terms, during the term of his tenure with Client, Consultant will not:

1.     Attempt to or in fact enter into or engage in any business which competes with the business of Client; or

2.     Attempt to or in fact solicit clients, business, patronage or orders for any service in competition with, or for any business that competes with, the business of Client; or

3.     Attempt to or in fact divert, entice, or take away any clients, business, patronage or orders of Client; or

4.     Attempt to or in fact promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with Client business.

(b)     Without limiting other possible remedies available to Client for breach of this non-competition provision, Consultant agrees that Client will be irreparably harmed by violation of this provision, and that injunctive or other equitable relief shall be available to enforce this provision, and that such relief shall be available without the necessity of proof of actual damage or the posting of a bond, cash or other security.

16.     <u>Non-Solicitation.</u>  Consultant acknowledges that Client has expended and will expend significant resources developing and cultivating its client base.   In recognition of these expenditures, and in consideration for Consultant's continued employment with Client, Consultant agrees that for the period of time equal to one (1) year, Consultant will not:

(a)     Attempt to or in fact solicit, accept any business from or perform any services for any clients, patronage, referral source, contact or individual with whom either Client had a relationship, or Consultant had a relationship on behalf of Client, in any geographic area, whether within or outside of Maricopa County, where either the Consultant or Client marketed, conducted business, solicited business, or had accounts or clients at the time of the termination of Consultant's tenure with Client, and at any time during the one (1) year period prior to such termination; or

(b)     Attempt to or in fact divert, entice or otherwise take away any clients, business, patronage or orders of Client within any geographic area where Client has operated, conducted business, marketed or solicited business at the time of termination of Consultant's tenure with Client, and at any time during the one (year period prior to such termination; or

(c)     In order to further the intent and purpose of this Paragraph 5, Consultant agrees that for a period of one (1) year following the termination of his/her

tenure with Client, Consultant will not contact any customer, client, patronage, referral source, contact or individual with whom either Client had a relationship, or Consultant had a relationship on behalf of Client, verbally or in writing, to announce Consultant's termination of his/her tenure with Client.

(d)     Without limiting other possible remedies available to Client for breach of this non-solicitation provision, Consultant agrees that Client will be irreparably harmed by violation of this provision, and that injunctive or other equitable relief shall be available to enforce this provision, and that such relief shall be available without the necessity of proof of actual damage or the posting of a bond, cash or other security.

17.     <u>Assignment of Inventions</u>. The Consultant hereby agrees to assign and does hereby assign to the Client, its successors and assigns, all rights, title, and interest in and to any and all ideas, discoveries, innovations, inventions, Proprietary Information, and other proprietary things which the Consultant may make, conceive, develop, or reduce to practice, or cause to be made, conceived, developed or reduced to practice, whether alone or jointly with others, whether patentable or not, during the term of employment with the Client (together the "Inventions" or individually an "Invention"), except any Invention as to which the Consultant can prove all of the following requirements (together the "Excluded Inventions" or individually an "Excluded Invention"):

(a)     The Excluded Invention was developed entirely on the Consultant's own time without using the Client's equipment, supplies, facilities, or trade secret information;

(b)     The Excluded Invention does not relate at the time of conception or reduction to practice to the Client's business, or actual or demonstrably anticipated research or development of the Client; and

(c)     The Excluded Invention does not result from any work performed by the Consultant for the Client,

Such assignments shall include, without limitation, any and all patent rights, copyrights (if and to the extent the work does not qualify as a "work made for hire"), trade secret rights and all other proprietary rights in any and all such Inventions. The Consultant agrees that all Inventions, other than the Excluded Inventions, shall be the sole and exclusive property of the Client,

The Consultant agrees promptly to disclose to the Client any idea, discovery, innovation, invention, Proprietary Information, or other proprietary thing regardless of whether the Consultant believes such information is assignable to the Client hereunder, The Consultant will make such disclosure to the person designated by the Client to receive such disclosures, and, if none, to the Client's President. The Client will receive any disclosure hereunder in confidence and will promptly determine whether the information disclosed qualifies under this Section 13 as an Invention assignable to the Client, and will notify the Consultant promptly of its decision, which decision shall be binding on the Consultant. Any evaluation or review by the Client of any disclosure

thereunder may be delegated by the Client's President to another Consultant of the Client or a committee.

Consultant agrees, without charge to the Client, but at its expense, from time to time at the Client's request (i) to execute, acknowledge and aid in the preparation of, all papers and documents, including applications for patents, copyrights, or other proprietary rights, as may be necessary, in the discretion of the Client, to vest or reflect title to such Inventions and all proprietary rights therein in the Client, its successors and assigns, and (ii) to protect and enforce the Client's proprietary rights in such Inventions in any and all countries.

If the Client is unable to secure the Consultant's signature on any such document, whether due to mental or physical incapacity, inability to locate the Consultant, or any other cause, the Consultant hereby designates and appoints the Client and each of its duly authorized officers and agents as the Consultant's agent and attorney-in-fact, to act for and in the Consultant's behalf and stead to execute and file any such document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights or other right or protections with the same force and effect as if executed and delivered by the Consultant. This appointment and designation is coupled with an interest and is irrevocable.

18.   <u>Prior Inventions</u>. As a matter of record, the Consultant has listed on **Exhibit C** attached hereto all inventions or improvements that have been made or conceived or first reduced to practice by the Consultant alone or jointly with others prior to the Consultant's employment by the Client. The inventions or improvements identified on **Exhibit C** are not subject to the provisions of Section 17. If there is no such list on **Exhibit C**, the Consultant represents that the Consultant has made no such invention or improvement at the time of signing this Agreement

19.   <u>Anti-Piracy.</u> Consultant acknowledges that Client has expended and will expend significant resources recruiting and training persons in its employ.   In recognition of these expenditures, and in consideration of Consultant's continued tenure with Client, Consultant agrees that:

(a)   For a period of one (1) year following the termination of Consultant's tenure with Client for any reason, Consultant will not directly or indirectly, at any time, hire, recruit, offer any employment to, solicit or induce, or attempt to solicit or induce any person(s), Consultant(s), sales representative(s), agent(s) or consultant(s) of Client to terminate their employment, representation or other association with Client.

(b)   Without limiting other possible remedies available to Client for breach of this anti-piracy provision, Consultant agrees that Client will be irreparably harmed by violation of this provision, and that injunctive or other equitable relief shall be available to enforce this provision, and that such relief shall be available without the necessity of proof of actual damage or the posting of a bond, cash or other security.

20.   Violation of Restrictive Covenants

(a)   For the purposes of Paragraphs 14, 15, 16, 17, 18 and 19, inclusive but without limitation thereof, Consultant will be in violation thereof if he or she engages in any or all of the activities set forth therein either directly as an individual on his or her own account, or indirectly as a partner, joint venturer, Consultant, agent, salesperson, consultant, officer and/or director of any firm, association, partnership, corporation or other entity, or as a stockholder of any corporation in which Consultant or Consultant's spouse, child or parent owns, directly or indirectly, individually or in the aggregate, more than ten percent (10%) of the outstanding stock.

(b)   If it shall be judicially determined that Consultant has violated any of his or her obligations under Paragraphs 14, 15, 16, 17, 18 and 19, then the period applicable to each obligation that Consultant shall have been determined to have violated shall automatically be extended by a period of time equal in length to the period during which such violation(s) occurred.  This remedy is in addition to any and all other rights and remedies that Client may have at law or in equity, including monetary damages.

21.   Communication of Restrictive Covenants.   For a period of one (1) year following the termination of Consultant's tenure with Client, Consultant shall provide a copy of this Agreement and shall communicate its contents to any person, firm, association, partnership, corporation or other entity which he or she intends to be employed by, associated with, or represent, and which is engaged in a business that is competitive to the business of Client.

22.   Reasonableness.   Consultant acknowledges that his or her obligations under this Agreement are reasonable in the context of the nature of Client's business and the competitive injuries likely to be sustained by Client if Consultant were to violate such obligations.  Consultant further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of Client to employ or continue to employ, as the case may be, Consultant, which Consultant acknowledges constitutes new and/or good, valuable and sufficient consideration.

23.   Notices.   Any notices required or permitted to be given under this Agreement shall be sufficient if in writing and hand-delivered or sent by Federal Express or similar service or by facsimile transmission confirmed to the following addresses and telephone numbers:

If to Client:        Worldwide Capital Holdings, LTD.
                     Nicholas Henkels
                     11259 East Via Linda Ste. 100-975
                     Scottsdale, AZ 85259
                     United States
                     Phone: (612) 220-8000
                     Email: nick@wcgcorp.net

BN 429357v1                              7

and

Steven M. Fox, Esq.
Buchalter Nemer
16435 N. Scottsdale Rd., #440
Scottsdale, AZ 85254
Phone: (480) 383-1824

If to Consultant:    Adam Ellis
22756 Valley Vista Circle
Wildomar, CA 92595
United States
Phone: 951-239-2027
Email: aellis@awjunkies.com

Waiver or Breach.  Any waiver by either party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by any party.

24.    Assignment.   This Agreement and the rights and obligations of the Consultant hereunder shall not be assignable without the written consent of the Client.

25.    Applicable Law.  It is the intention of the parties hereto that this Agreement and the performance hereunder and all suits and special proceedings hereunder be construed in accordance with and under and pursuant to the laws of the State of Arizona and that in any action, special proceeding or other proceeding that may be brought arising out of, in connection with or by reason of this Agreement, the laws of the State of Arizona shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

26.    Severability.   All agreements and covenants contained herein are severable, and in the event any of them shall be held to be invalid by any competent court, the Agreement shall be interpreted as if such invalid agreements or covenants were not contained herein.

27.    Entire Agreement.  This Agreement constitutes and embodies the entire understanding and agreement of the parties and supersedes and replaces all prior understandings, agreements and negotiations between the parties.

28.    Waiver and Modification.  Any waiver, alteration or modification of any of the provisions of this Agreement shall be valid only if made in writing and signed by the parties hereto.  Each party hereto, from time to time, may waive any of its rights hereunder without effecting a waiver with respect to any subsequent occurrences or transactions hereof.

BN 429357v1                                        8

29.    Attorneys' Fees and Costs.  In the event of any dispute arising out of the subject matter of this Agreement, the prevailing party shall recover, in addition to any damages assessed, its attorneys' fees and court costs incurred in litigating or otherwise settling or resolving such dispute.  In construing this Agreement, none of the parties hereto shall have any term or provision construed against such party solely by reason of such party having drafted the same.

30.    Counterparts and Facsimile Signatures.    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Execution and delivery of this Agreement by exchange of facsimile copies bearing the facsimile signature of a party hereto shall constitute a valid and binding execution and delivery of this Agreement by such party.   Such facsimile copies shall constitute enforceable original documents.

**IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement as of the day and year first above written.

CONSULTANT:

CLIENT:

Worldwide Capital Holdings,
a Deleware corporation

By:
Its:    President

# EXHIBIT A

## SERVICES PROVIDED TO CLIENT BY CONSULTANT

The Consultant shall provide the following services to the Client as part of this Consulting Agreement:

The services include but are not limited to; software development and programming, technical maintenance and main technical point of contact, site management, implementing and testing for companies online risk mitigation prevention tactics, systems management, tracking and data analysis, implement new systems and programming for technical advancement in clients verticals.  Consultant will be the main technical point of contact for company in all aspects. The Parties agree to revise the scope of work expected from Consultant from time to time as the case may be and the foregoing is not an exhaustive list of Consultant's duties to the client.

## EXHIBIT B

## CONSULTING FEE

I.  <u>Basic Compensation.</u> Consultant will be compensated based on an annual salary of $65,000 paid bi-weekly according to normal payroll and payroll procedures of the client.  Annual salary is not structured on hourly basis or work week, but on total work load and tasks or projects to be completed on a daily, weekly, monthly or annually basis.  Work load and projects will be based on required or estimated deadlines to be completed deemed reasonable for consultant and approved by client in writing.

II.  <u>Profit Sharing.</u>  Consultant will be eligible to receive a quarterly bonus payout based on 5% of clients "Net Profit*.  Quarterly bonus payouts are paid no less than 30 days or no greater than 45 days from the quarter completion date for the previous quarter. Per this contract total compensation package not to exceed $200,000.

*"Net Profit" - Net Profit is based on the Clients Net Profit of ownership from operating entities and partnerships, in which Consultants performance directly relates and contributes to the success of the organizations. Net Profits are defined under this Section as Gross Revenues of the Client, less all expenses incurred by the Client.

11

# EXHIBIT C

## PRIOR INVENTIONS

I.    Base code and classes relating to general modular design. All inclusive to
      database and core related communication and data gathering, processing,
      and displaying. Each file will display appropriate copyright info prior to
      being uploaded or used with client.